Chubb Lloyds Insurance Company of Texas May it please the Court, Counsel, I'm appearing on behalf of Mr. and Mrs. Ayoub, is the pronunciation of their name, Your Honor. This property insurance dispute governed by Texas law presents three issues. The first is whether the Ayoubs were required to show the amount by which their admittedly covered casualty loss should be reduced by depreciation. The second is, if they were, whether the evidence they came forward with on that issue was enough to avoid summary judgment. And then the third was, regardless of the resolution of the underlying coverage dispute, whether or not the district court correctly dismissed their extra-contractual claims. Because resolution of the first issue in favor of the Ayoubs moots the second and third issues, I'd like to devote the initial part of my argument to the first question, and then, time permitting, address the next two. The central fact questions in the case concern the amount of the Ayoubs' losses to their personal property. The home was insured for slightly more than $2.5 million. Their personal property was insured for slightly more than $506,000. Those factual issues, in our view, were prematurely decided on motion for summary judgment on the sole basis that they did not come forward with admissible evidence of the amount by which their home had depreciated and by which their personal property had depreciated. The principal legal question before the court is whether that was a burden that the Ayoubs, as the insured, bore the burden of proof of coming forward with, or whether it was a limitation of coverage, which under Texas law would require Chubb to both affirmatively plead and come forward with admissible evidence somehow showing that the Ayoubs had not met their burden of proof of showing a covered loss and the amount of that covered loss under the policy. In our view, this was not a burden that the Ayoubs carried, and we think that settled Texas law supports this. We start with the settled rule most recently pronounced in 2008 by the Texas Supreme Court in the Allied Pilots case cited by both parties. If an insurance contract covers certain risks but the policy contains exclusions or limitations of coverage, when the insured makes a claim for a loss from a covered risk, the insurer must assert any applicable exclusion or limitation to avoid liability. An exclusion or limitation you normally would think would be you'd have a coverage provision, and then somewhere else it would say, but there's a limit here or there's a separate exclusion for this. So whereas this just seems to be all wrapped up into one provision, how you're getting coverage for replacement costs in the first place, where else in the insurance policy does it show what the coverage would be? Well, Judge Costa, I think the coverage is there because the coverage is for a loss to the dwelling and or to the personal property, and we have both in this case. What about the measure of recovery or damage? That's the key point. The policy does not define what the measure of damages is. It does not tell you how you have to measure the amount that the AUs are required to cover under the policy, and that's the central point that the CRISP decision decided by the Texas Supreme Court in 1963 made. The measure of damages under the policy for the covered loss is the actual loss to the insured, and we'll talk about the different ways that can be proven. What happens with respect to this policy is that it establishes limitations on the amount that Chubb will pay for that loss, and that's in the endorsement that's cited in our brief and quoted extensively. And if you look at that, what the policy and what the endorsement speak to is not how the loss is to be measured. It's the limit of what Chubb will pay. The amount of the loss, as CRISP shows, is measured by what the actual loss is. Once the AUs come forward with proof showing this is the amount of our loss, the burden then devolves to Chubb to say, well, we're going to reduce that loss because our limit is one of three things. It's the actual cash value of the personal property, less proper deduction for depreciation, the replacement cost of the personal property, again, with a deduction, proper deduction for depreciation, and for the dwelling, reconstruction costs, less depreciation. In your view, Chubb doesn't come forward with meeting their burden on some of these limitations, you're calling them. What's the source of what you would have to prove of your damages? Is that just common law? Absolutely. That's what the Texas Supreme Court said in 1963 in the CRISP case, and they said that there were any number of ways that an insurer could go about proving the amount of that loss. And when you think about it, they specifically held, for example, that because of the uniqueness of personal property, which was at issue in the CRISP case in particular, that the insurer doesn't have to come forward proving market value. And that makes sense. How do you prove depreciation with respect, for example, the suit I'm wearing? If I paid $500 for it and I've had it two years, do we depreciate it by $100, by $50, or is the proper measure of damages what it costs me to go out and buy a new suit so that I can appear in court today? That's an example of what the Texas Supreme Court was saying there. And in the Culvert case, which deals with, which is also cited in the brief, and which also deals with a homeowner's policy, but with respect to the structure, how do you prove, for example, that the marble flooring in the AU's home depreciated by a certain amount, and over what period of time? That's what the Texas courts have dealt with, and that's why they have adopted the broad evidence rule as far back as 1959 in the Melton case, decided by the Texarkana court, which is also cited in our brief. The key in these cases is understanding, and this is where the district court erred, and where Chubb is incorrect. The policy language doesn't establish the measure of damages. It simply says, using whatever measure of damages is appropriate, our liability for that loss is not going to exceed these three things. That's why Chubb, not the AU's, bore the burden of proof on this issue. The policy language supports that. What does it say with respect to loss settlement? Our limit of liability will not exceed. That's the relevant language in the clause. That is a classic limitation of coverage on which Texas courts have consistently held the insurance company bears the burden of coming forth with pleading that provision as well as coming forward with evidence. And what does it say about that with respect to personal policy, the actual cash value for the cost to repair and replace, and with respect to the dwelling, our limit of liability is reconstruction costs. Again, we will pay the reconstruction costs less depreciation. Those are limitations on its obligations under the policy that it is obliged to prove. Well, what do we have here? Chubb determines that the amount of the covered loss for the AU personal property is $250,000. Mr. AU is dissatisfied with that, prepares an extensive inventory, which is a record, itemizing everything that's in there, which is entirely proper under Texas law, as CRISP and dozens of other decisions make clear. He comes up with a loss of more than $700,000, which would entitle him under the policy to at least $506,000. Chubb does not come forward and say there's anything wrong with this other than on about $200,000 of items, there's an insufficient description. It's not as though they say with respect to this particular table, you've overvalued it. It's not as though they say with respect to this particular painting, it wasn't worth that much. All they really say is he can't say that because he's not an expert, a contention the district court properly rejected under the traditional property owner rule that says a property owner can give an opinion as to the value of his or her property. The only thing they say is, well, he doesn't account for depreciation. Well, he doesn't have to. He doesn't have to do that. CRISP makes it clear that all he has to do is come forward with some evidence showing his actual loss. I'd also point it out that Mr. Ayoub, as an experienced businessman who had owned 85 duty-free stores, was in a position to say, as he did in his declaration, that many of the items we own had appreciated in value rather than depreciated. And if you think about that with respect to certain items of furniture, for example, an end table that might be an antique, it is indeed likely that that was the case rather than depreciating. But Chubb's only defense to that and the only basis on which the district court granted summary judgment was that he didn't put anything in for depreciation. That was error. The same is true with respect to coverage under the dwelling. Chubb says that the cost to reconstruct the home, the dwelling, is $488,000. The contractor they hired came up with the estimate. He reduces and arrives at his $488,000 figure by taking a 15% across-the-board deduction for depreciation. Where does he get that? Strictly from Chubb's adjuster, which I'll submit to you makes sense. Mr. Fix, retained by Mr. Ayoub after he becomes dissatisfied with Chubb's estimate, pegs the loss at $1.4 million. And even though he doesn't have to, he deducts $98,000 for depreciation. And where does he get that figure? He gets it from Mr. Skipton, a public adjuster retained by the Ayoubs. Mr. Fix, in essence, did the exact same thing that Mr. Yudzitsky, I'm sure I've mispronounced his name, who was retained by Chubb, they simply arrived at different figures. Again, you have a classic fact issue. One value here claimed by the insured, another value here claimed by the carrier. Well, what happens? Chubb says, well, we don't know how he arrived at this amount for depreciation. Well, let's assume that that's true. The answer to that is, so what? He did not even have to take anything for depreciation. All the Ayoubs were required to do under the broad evidence rule was come forward with some evidence showing the amount that it would cost to repair the home, to replace various items in reconstruction or to reconstruct it. That's all they were required to do. But even if Mr. Fix was somehow obligated to put in a depreciation factor, it's clear that his reliance upon David Skipton was a proper method of doing that. And how do we know that? That's exactly what Chubb's estimator did, relied upon Chubb's adjuster, Mr. Blackburn, to come forward with an amount to depreciate his estimate. Because if you look and see what the Texas Supreme Court says, again, it says, the trier fact may consider the original cost, cost of replacement, opinions upon value given by qualified witness, and there's no suggestion that Mr. Fix was not otherwise qualified to give his opinion as to the estimate that he prepared, which, again, was detailed in which established the amount of the loss. I'll suggest to you that under the court's construction of evidence rule 703 in the factory mutual case cited in our brief that what Mr. Fix did is exactly what other expert estimators do. When they need a depreciation factor, they go to a public adjuster. And I think this raises the more basic question, do you even need expert testimony on depreciation? As I said in the reply brief, it's a matter of common knowledge that every year millions of Americans, such as myself, and I'm not an expert, depreciate property. And how do they do that? They use a straight line method. They use accelerated depreciation. They rely strictly upon essentially what's set forth in the IRS guidelines. Depreciation is simply not something, particularly with respect to personal property in a home dwelling, that requires scientific, technical, or specialized knowledge. Lastly, if there was a basis for dismissal of the contract claims, we submit that the extra contractual claims should have survived. There was evidence that the AUs, as a result of Chubb's method of handling the adjustment of their loss, caused additional damage outside the policy. The dwelling became uninhabitable, reduced in value. In addition, because of Chubb's failure to conduct certain electrical and plumbing repairs, landscaping, which was not covered under the policy, was also damaged. We submit for these reasons, as well as those cited in our brief, that the judgment should be reversed and the case remanded for trial. I'd be happy to answer any questions the Court might have. Thank you, sir. Thank you. Ms. Markman. Good morning. May it please the Court. The issues before the Court, first, are whether the burden of proof lay with Chubb to plead and prove depreciation, or if it was properly the plaintiff's burden that they failed to meet. Then the second question is, of course, if they were required to do that, did they have the evidence that was sufficient to do those things? And then the third question before the Court is the extra contractual claims, whether they can survive in the absence of a breach of contract. Judge Costa, you asked whether the policy addresses the measure of damage, and it very, very clearly does. The appellant has chosen to focus on the policy language that is about the limit of liability, which is the same as in all the cases they cite, but which is not relevant to this proceeding. It, in fact, is the measure of damage provision that's actually just below that that's relevant. The measure of damage provision says, if you have a covered partial loss to your dwelling or another structure and do not begin to repair or replace or rebuild the lost or damaged property within 180 days from the date of loss, we will only pay the reconstruction cost less depreciation. That language specifically says what the amount of payment is, how it will be calculated. So you're saying what comes above that is a limitation provision, but then that provision is a measure of damage provision? Yes, Your Honor. So specifically with regard to the dwelling, it shows 4 and then A, and A says our limit of liability, and it gives that section language that is extremely similar to the cases that are cited by appellant. But if you look down at, then there's B, and then, which is, again, another condition that would follow the same kind of language. Below that, and it's in appellant's brief on page 10 of their brief, the very last paragraph, if you have a covered partial loss, and it specifically does give what the payment calculation is. But it's still couched in terms of a limit. It says we'll not exceed this minus depreciation. No, it says we will only pay the reconstruction cost less depreciation. So it says what they will pay. Let me ask you this. Who has the burden under that provision of showing that they did not, of the provision that if you didn't rebuild within 180 days, who has the burden of forgetting the depreciation burden, but the burden to show you didn't do anything within 6 months, 180 days? In this case, I think, number one, I think that it is part of meeting the coverage for replacement cost. So therefore, I do think it would still be the insured's burden. However, in this case, the evidence was undisputed that they did not begin to repair, rebuild, or replace within 180 days. The district court found that. That hasn't been challenged. No, but in a case where it is disputed and the insured says, oh, yeah, I started fixing it up, so I'm not within this, I don't have to deal with this depreciation issue. And then the insurance company is going to say, no, there's no evidence that you, you know, we can show you didn't do anything to change, to repair your house. Who has the burden on that? I still think it's coming within the coverage grant to get replacement cost. But I do think it's specifying what the coverage is, so I think that all of that is going to be the insured's burden to prove as opposed to a limitation or an exclusion. But the insured doesn't want to be in that provision. They want to get the better recovery, right? I agree they do. But I think it's not any different than in the case of the Block case, Employers Casually versus Block, where the Texas Supreme Court did their analysis, and the question there was the timing. The policy there specified that it applied only to damage which occurs during the policy period. So, again, if the insured gets in there, then they've got coverage. If they can't, if they're not in there, and the insured complained that the carrier came in at trial without having pled it in advance, alleged that the damage occurred outside the policy period, and they said, well, that's something that needs to be pled as an affirmative defense. And the Texas Supreme Court said, no, it's a precondition to having that coverage. So I think it's the same here for our replacement cost coverage. It is a precondition to having that coverage that you begin to repair, rebuild, or replace within the time specified. There's a similar provision for the personal property, which isn't in appellant's brief but is on record at 851. Again, there's a similar provision about what the limit of liability is, which is, again, not the issue here. But it goes on to say, we will pay you the replacement cost of your damaged property up to $1,500 and the actual cash value of your remaining damaged property. So, again, it's very clear about what the payment terms are. To get replacement cost coverage, it goes on to say, if you repair or replace the damaged property, you may make a claim for reimbursement on a replacement cost basis for the replacement cost of your property exceeding $1,500. You must repair, restore, or replace the property within 365 days after the loss. So, again, it's very clear about what the payment terms are. And so, it is a precondition to coverage and, therefore, the insurer's burden that they plead and prove, or I suppose they don't have to plead, but they do have to prove that that's what their measure of damages is. The question of whether just having this evidence of what the repair costs are, isn't that enough to get past summary judgment? The point of summary judgments is to try to see if we can keep cases from going to trial that can't ultimately be submitted to the jury. If on the evidence here, the case were tried, it could not be submitted to the jury because the jury couldn't possibly determine if there was a breach of contract because there isn't all the evidence that they need to determine is the amount Chubb paid, close to a million dollars all told, is that insufficient to pay the covered loss? Because in both cases, it's only the actual cash value based on what the evidence in the record is. Looking at what their evidence was, Mr. Fix certainly was qualified to prepare a repair estimate, but his depreciation in the disclosures is no more than a line entry with an amount. On deposition, he said he could not explain where that amount comes from. He didn't know the basis for it. He had prepared his estimate. He sent it to the public adjuster and asked him, how do you want me to do depreciation? The public adjuster sent him back the percentages, and he plugged them in. Now, is that the kind of information that he could reasonably rely upon? I will say first, I don't believe there's evidence in the record. They certainly didn't have any evidence from Mr. Fix that that's the kind of information that he relies upon in his profession. Their evidence about Mr. Uditsky was that he said when he prepared his, he asked the adjuster, what percentage do you want to show for depreciation? And that's what he was given. That's not information that we certainly have offered. I don't believe it's reliable as Mr. Uditsky's opinion. Could the adjuster give that? Yes. If there were a basis for Mr. Skipton's opinion that the court had before it, then could that potentially be the kind of information that if there was evidence that Mr. Fix regularly reasonably relies on that? Could that work? It certainly could. But the record in this case is that there's no explanation from even Mr. Skipton of how he comes up with this figure. Mr. Skipton was not designated to give opinions about damages or depreciation. He was designated as an expert. He did give opinions, but they were limited solely to claim handling. And so, therefore, there was no basis. So if you need depreciation, then obviously you need a foundation for that. Could an individual potentially have the ability with his own property to give that kind of testimony? I think so. But he'd have to, again, show the right foundation for it. Even lay witnesses can't come into court and say the value of my home is $1 million. Well, why do you think that? I just do. You have to have a basis for that. And so could Mr. Iyub on his personal property have said this is what I think the depreciation is? Certainly, but I think he still would have, one, had to have had a basis for that opinion. I think, two, that they would have had to disclose that opinion, which they did not. I think, three, it'd have to be in the summary judgment evidence, which it's not. Specifically with regard to the personal property, Mr. Iyub's summary judgment evidence is only the inventory. I thought he gave a replacement value. Correct. The CRISP case seems to say that with personal property, since there's really no true market out there to measure that, it's a really broad leeway of evidence that can be considered, including replacement value. Doesn't it say that? The actual damages might not be replacement value, but replacement value is probative evidence of what the market value would be. Isn't that what CRISP says? So I think, Your Honor, yes, that is what CRISP says. But I think the distinction here is that CRISP, one, is talking about this idea of limitation without a policy that specifically says this is how it's paid. And I think the case law is very clear that the court is bound to follow the language of the policy. That's the thing that I always tell associates gets interesting when you start looking at insurance law cases is you always have to go back and look at what's the language? Because insurance companies are smart in some ways, and when they get case law, they can rewrite policy language to reflect that. And I think that it's been enough years since CRISP that that's what's happened here, is that insurance companies have gotten smarter about how they express what their intent is so that hopefully courts can see that and follow that. And I think here where the insurance company is saying with regard to the dwelling, we will only pay the reconstruction cost less depreciation, and when they are saying with regard to personal property, we will pay $1,500 worth of replacement cost and the actual cash value of your remaining property, I think that's very clear language that the court needs to follow. Now, had Mr. Aiyud testified that the actual cash value of my property is this and had a basis for that, then I think that this is a different ballgame, and I think we aren't here, that summary judgment wouldn't have been granted. Well, given that Texas courts have recognized there's no true market for someone's 10-year-old furniture, what evidence would someone be able to come forward with to show actual cash value? So I think actual cash value is, well, first, I think there is a market for it. I think, you know, this day and age, people, garage sales and Craigslist and all those wonderful things. So I think there is a way to determine that. You know, we have an expert in this case whose job it is to do the market research and come up with values for these things, and that was the basis on which Chubb made its payments. So I think it is possible to do. I think Mr. Aiyud didn't do that. I think they operated under the presumption that this was not their burden and therefore made no effort to create admissible evidence in that regard. The final question is the extra-contractual claims. Can the extra-contractual claims survive if there's no evidence of a breach of contract? The Texas Supreme Court has repeatedly said that in most circumstances, if you don't have a breach of contract, if you can't show that the carrier failed to pay you what you were owed under this contract, then your extra-contractual claims are going to fail. It is recognized that there will be some circumstances in which there is an extreme act that causes an independent injury and that the courts have said that shouldn't be barred if you get that situation. But no, deliberately, that extreme act is so rare that it's not, I've not seen a published case, I've looked, in which that's happened in, you know, it's been more than a decade, it may be getting close to two since that was the law in Texas. There's no evidence in this case of an extreme act. The things that are pointed to in appellants' brief and reply are the kind of things that are directed at claim handling. You didn't pay me what I think you owe me on time, and so I wasn't able to make these repairs. They are all claim handling things. And so the fact that they showed additional injuries, such as their contention about their landscaping, et cetera, could that get them over the hump if they had also a breach of contract claim to then get extra-contractual damages for things that aren't covered? Sure. But they have to get over that first hurdle of having a breach of contract claim, of showing that the carrier's payment on the claim, its ultimate disposition of it, was not in compliance with the contract. In the absence of that, then causation fails. Unless the Board has any questions for me. How much was paid on the personal property claim? About a quarter of a million dollars, a little more. Anything else? No. Okay. Thank you. Thank you. Mr. Martin, Mr. Hood, you have five minutes. Let me explain why Chubb's argument on extra-contractual claims are wrong because I did this 21 years ago when I argued Stoker. In response to Justice Doggett's question, I gave him an example of where you could have extra-contractual damages for non-covered loss. Stoker's a perfect example. There was no coverage because there was no contact between the uninsured motorist vehicle and the insurance vehicle. But the adjuster denied the claim because he felt Mrs. Stoker was at fault, just overlooked that provision. As I told Justice Doggett, let's assume that the adjuster in that case had said, yeah, we think there's coverage, and Mrs. Stoker had gone out and repaired her vehicle and then later on come back and said, whoops, I was wrong because there was no contact. Well, clearly, had she expended those funds and gone out and repaired the vehicle, even though he may have simply been negligent and not committed any sort of extreme act or intended to mislead her, she would be entitled to recover from the insurance company what she had expended in repairing her vehicle. Why? Because she had relied upon a representation, however innocent, that caused her to suffer an injury, an extra-contractual loss that had nothing to do with the policy. And if you look at the way the statutes are framed now, they don't require anything in the way of an extreme act. But let's go to the more fundamental issue that we have before the Court. Chubb has confused the grant of coverage with the manner in which payment for the loss is made. That's the fundamental problem that Chubb has. There is no dispute that the AUs suffered covered losses to their dwelling and to their personal property. And those grants of coverage are in other areas of the policy. Instead, the provisions that Chubb has focused upon, and the one we quoted in our brief, it's a loss settlement provision. And what does it say? Our liability, limit of liability, and payment for covered losses will not exceed the smallest of the following. And that's where you get into actual cash value. Doesn't your client pay extra for this endorsement? I mean, it gives them extra coverage. And so it does seem like it's giving them a new measure of damages. Well, I'll suggest to you that he paid for it, but he didn't really get anything that he otherwise wouldn't have had. It's one of the great marketing scams of the century, Judge Costner. Maybe that's a whole other lawsuit. It's a whole different. But you see my question? I do. If he's buying something additional, you'd think there'd be a new measure of damages in that provision that he's paying extra for. Well, there is supposedly a benefit. I mean, they tell you, for example, well, Joe, you paid, you know, that suit may not be worth $250, but you can go out and buy another suit and we'll pay you for that. I mean, in theory, that's what's behind that. Or your television, okay, your TV is 10 years old, but you can go out and buy one of these new flat panel ones and we're not going to quibble about that. But the central fact, Judge Costa, is that the location of these provisions are under a law settlement. They're not in the coverage clauses of the policy. They're just not there. And they speak of a limit of liability. Chubb is obligated to pay for the loss, whatever that is, subject to the three conditions that they put forth as limitations in the law settlement provisions of the policy. And you go back to classic Texas case law, and that case law says this is the insurance company's burden to come in and show that. And they simply didn't do it. They didn't plead any provision of the policy to that effect. They just said subject to whatever the policy says. They didn't come forward with any evidence showing what the amount of depreciation really should have been. Just not there. They simply said, King's X, you guys didn't prove it. Well, they were wrong. It wasn't Mr. and Mrs. Aube's burden to show that. But even if it was, I go back to what the evidence shows. The evidence in this case, what better evidence can there be than just the industry standard, I guess. The industry standard apparently, from Chubb's standpoint, is we'll get somebody to estimate the value, and then our public adjuster will apply a factor of depreciation there. That's what the evidence shows here. And under the liberal standard enunciated by this court, interpreting Texas law, as well as the Texas Supreme Court in numerous decisions, that was plainly sufficient to avoid summary judgment. A jury may disagree with Mr. and Mrs. Aube. They may think, well, you've got enough money simply because you're wealthy enough to have this nice a house. But they may not. But the Aubes, notwithstanding, their wealth are entitled to the same constitutional right to a jury trial as anybody else. The judgment should be reversed. Thank you, Mr. Hood. That concludes our argument.